IN THE UNITED STATES DISTRICT COURT
FOR WESTERN DISTRICT OF VIRGINIA



IN THE MATTER OF THE SEARCH

OF an Iphone 6, model: A1688,

FCCID: BCG-E2946A, IC:

479CE2946A, hereinafter the

"Device."  The Device is currently

located in an evidence locker at the FBI

Field Office, 1970 Parham Road,

Richmond, Virginia.

Case No. 3:17mj00030

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Stephen Duenas, being duly sworn on oath, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a search warrant authorizing the examination of property—an

electronic device—which is currently in law enforcement possession, and the extraction from

that property of electronically stored information described in Attachment B.

2.      I am an "investigative or law enforcement officer" of the United States within the

meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to

conduct investigations of, and to make arrests for, offenses in violation of Title 18 and Title 21, United States Code.

3.     Specifically, I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since January 2000. I am currently assigned to the Richmond Division of the FBI, Charlottesville Resident Agency.  Prior to my employment as a FBI Special Agent, I served as a Deputy Sheriff for the Pima County Sheriff's Department from January 1996 to January 2000.  I am presently and have been previously assigned to investigate a variety of criminal matters, to include violent criminal acts, gangs and firearm investigations.  Further, I have experience and training in a variety of investigative and legal matters, including the topics of lawful arrests, the drafting of search warrant affidavits, and probable cause.

4.     The statements in this affidavit are based on my personal observations, my training and experience, my investigation of this matter, and information obtained from other agents and witnesses.

5.     I have participated in numerous criminal investigations focused on firearms, armed drug trafficking violations and criminal street gangs.  I have investigated violations of Title 18, United States Code, Section 1962 (Racketeering Influenced Corrupt Organizations Act), Title 18, United States Code, Section 1959 (Violent Crimes in Aid of Racketeering), Title 18 United States Code 924 (Weapons Offenses), and Title 18 United States Code 841 (Drug Offenses). I have experience in the investigation, apprehension and prosecution of individuals involved in firearms offenses and narcotics trafficking offenses.  I have also been trained on the use of cellular and electronic devices, too include performing forensic examinations on such devices.

2

6.     The Federal Bureau of Investigation (FBI) and other agencies have been investigating the "Mad Stone Bloods," also known as "Mad Stone Blood Nation", "MSBN" and "MSB" (MSB) since 2012.  I am aware of criminal acts conducted by MSB members, and these offenses include and are not limited to; homicide, aggravated assault, drug distribution, racketeering, weapons offenses, and fraud.

7.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED[1]

8.     The property to be searched is an Iphone 6, model: A1688, FCCID: BCG-E2946A, IC: 479CE2946A, hereinafter the "Device."  The Device is currently located at the FBI Field Office, 1970 Parham Road, Richmond, Virginia[2].

9.     There is probable cause to believe that the Device contains evidence, fruits, and instrumentalities of the crimes listed above, and the applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

---

[1] On June 2, 2017, Counsel for Defendant Jones filed a Motion For Return of Property and to Prohibit Search or Suppress, Case no. 7:16-cr-30026 (ECF 345).  On June 9, 2017, the Government filed a response asking the Court to deny to Defendant Jones' motion (ECF 361).  The motion is scheduled to be heard on June 16, 2017, by the Honorable Michael F. Urbanski.

[2] The Government intends to transfer the Device from the FBI Field Office located at 1970 Parham Road, Richmond, Virginia to the FBI Resident Agency in Charlottesville, Virginia - a satellite office for the FBI Field Office in Richmond, Virginia).  The search of the cellphone will occur at 2211 Hydraulic Rd, Suite 201, Charlottesville, Virginia

3

## **PROBABLE CAUSE**

10.     Based on my own personal knowledge of the investigation and discussions with other members of law enforcement, I am familiar with the organizational structures and many members of MSB.

11.     MSB is a criminal enterprise, as defined by Title 18, USC 1961(4) (RICO), and Title 18, United States Code, Section 1959(b)(2) (Violent Crimes in Aid of Racketeering);

12.     MSB is a national street and prison gang that operates in a number of states, including New York, New Jersey, Virginia, North Carolina, Georgia, Connecticut, Texas and Maryland.  MSB has multiple subgroups that use two names to identify themselves, one "official" name and one "nickname" associated with clothing lines. There are nine different male subgroups and one female group throughout MSB

13.     MSB leadership is located in Brooklyn, New York. The national leader of MSB is known as The Global Chairman[3].  The Global Chairman has absolute authoritarian rule over all MSB members and activities nationwide, and has the authority to order or conduct any action related to MSB.  The Global Chairman has the sole authority to open or close entire MSB "hoods" throughout the country, resolve political disputes, order or authorize violence on non-gang members and gang members, and order or authorize criminal activity, including murders, assaults, robberies, narcotics trafficking and firearms offenses.

14.     MSB leadership is comprised of what is referred to as the Executive Council. The Global Chairman is the leader of this council which includes high ranking MSB members that

---

[3] Throughout this investigation, the Global Chairman has been identified as William Seeley ("SEELEY"), aka "Poppa Don".

4

3:17mj00030

oversee the motherhood and the various MSB subsets. The Executive Council also oversees the leadership of other MSB sets located in other states.

15.     The organization includes; Mad Stone Bloods a/k/a "Gucci" (a subset with the same name as the overall organization, also called "the motherhood"),

Mad Stone Gangsters a/k/a "Prada",

Mad Stone Henchmen a/k/a "Tom Ford",

Mad Stone Kartel a/k/a "Fendi",

Mad Stone Dynasty a/k/a "Versace",

Mad Stone Money a/k/a "Louis (sic) Vuitton",

Mad Stone Killers a/k/a "Ralph Lauren",

Mad Stone Mafia a/k/a "Tommy Hilfiger",

Made Stone Empire, and

Mad Stone Divas a/k/a "Chanel", the female only subset of MSB.

16.     On 10/26/2016, thirteen members and associates of MSB Virginia and New York, including Michael JONES, a/k/a "M-Stone" ("JONES"), were indicted by a Federal Grand Jury, located in the Western District of Virginia, at Charlottesville, for violations of Title 18 USC 1962(d), Racketeering Conspiracy, Title 21 USC 846 and 841, Conspiracy to Distribute Controlled Substances, Title 18 USC 1959(a)(3), Assault with a Deadly Weapons in Aid of Racketeering and Title 18 USC 924 Weapons Offenses.

17.     On November 17, 2016, JONES was arrested for violations of Title 18 USC 1962(d), Racketeering Conspiracy, Title 21 USC 846 and 841, Conspiracy to Distribute Controlled Substances, Title 18 USC 1959(a)(3). At the time of his arrest, the Device was seized

5

from JONES' person.

18.    JONES is a high ranking MSB New York member and a member of the Executive Council.  During the investigation it was learned that JONES was known by MSB members as "the voice of Poppa Don", speaking for SEELEY, the Global Chairman.  MSB members have attempt to insulate SEELEY from law enforcement detection to protect both him and the gang.  As the "voice of Poppa Don", JONES' role is to communicate with MSB members in Virginia and elsewhere.  Throughout the course of the FBI investigation into the MSB, JONES has been captured on multiple consensually recorded telephone calls and cooperating MSB members have told law enforcement about conversation with JONES via phone.

19.    Throughout the investigation, multiple MSB leaders and members who are co-Defendants with JONES have agreed to cooperate with law enforcement.  As part of their cooperation, the cooperators discussed their involvement with MSB and its members.  During these discussions, JONES was identified as a high ranking leader of MSB, located in New York. Cooperators told law enforcement that JONES is involved in criminal activity, specifically, narcotics.  The following information was provided as it relates to JONES:

   a.  Defendant A, during an interview with law enforcement stated that he had telephone contact with JONES in 2013.[4]

   b.  Defendant B, during an interview with law enforcement stated that he had

---

[4]On May 2, 2016, as part of this investigation, Defendant A, plead guilty to a violation of 18 USC 1962(d).  As part of his plea agreement, Defendant A agreed to cooperate with the Government.  Defendant A is a former MSB Four Star General. Defendant A's criminal history included felony drug distribution, robbery and various misdemeanor offenses.

6

telephone contact with JONES in 2014. This conversation was a three way call between JONES, Seeley and this defendant. [5]

20.     Defendant C, during an interview with law enforcement, stated that he had telephone contact with JONES prior to his arrest in September 2016.  Defendant C permitted law enforcement to look at his cellphone.  A review of Defendant C's cellular telephone identified two contacts numbers (917) 653-9249[6] and (917) 297-1534.  During this review of Defendant C's call history, law enforcement learned that (917) 297-1534 was also utilized by JONES.  A review of Defendant C's call history showed he last called (917) 297-1534 on 09/18/2016, indicating that this defendant and JONES had their last call on that date. Defendant C was arrested on 10/25/2016.[7]

21.     During the course of this investigation a cooperating witness (CW-1) has recorded hundreds of consensually monitored telephone calls, in person voice and video recordings. The majority of the calls and conversations were recorded by the FBI and/or by CW-1 using FBI issued equipment. These recordings have been reviewed by the FBI and most have been summarized.[8]

---

[5] Defendant B, was a Five Star General in the MSB and has been charged under this indictment in Count one with a violation of 18 USC 1962(d) and Count two with Title 21 USC 846 and 841.  At the advice of counsel, Defendant B is cooperating with this investigation. This defendant's criminal history felony drug distribution and lesser misdemeanor offenses.

[6] During this investigation, law enforcement determined (917) 653-9249 to belong to JONES.

[7] Prior to his arrest, Defendant C, was one of the highest ranking MSB members in Virginia who was not incarcerated. Defendant C was been charged in this indictment with Count one with violation of 18 USC 1962(d) and Count two, Title 21 USC 846 and 841(a)(1) and (b)(1)(A) in this matter and under the advice of counsel is cooperating with this investigation. This defendant's criminal history includes felony drug distribution, firearm possession during a drug crime, firearm possession by a non-violent felon and lesser misdemeanor offenses.

[8] CW-1 was a high ranking MSB leader who has plead guilty to a violation of Title 18 USC 1962(d) in this matter, and under the advice of counsel has been cooperating with this investigation. CW-1's criminal history includes, felony forgery and uttering, felony drug distribution, felony drug possession, and lesser misdemeanor offenses.

7

22. On June 27, 2013, CW-1 received a text message from JONES, who was using cellular telephone (904) 385-4552, which was followed up by a voice call from JONES at this number. JONES advised that there were a lot of changes coming up for the MSB and JONES asked CW-1 to come to New York and meet with him to discuss these changes.

23. On July 23, 2013, CW-1 received a text message from JONES, who was using cellular telephone (904) 385-4552. JONES told CW-1 where to stay when CW-1 came to New York. On 07/26/2013, JONES called CW-1 from (718) 455-0286, a cellular number CW-1 believed to belong to JONES. During this call JONES and CW-1 discussed an incident between MSB members and G Shyne Blood members in Virginia. JONES also discussed the organization of MSB sets in multiple states including Virginia.

24. In April 2013, and July 2013, CW-1 received multiple text messages and communicated with Michael JONES via cellular telephone (904) 385-4552. MSB business was discussed during these conversations.

25. In January 2014, CW-1 advised law enforcement that JONES was currently using cellular number (252) 933-8712.

26. February 2015 the FBI requested and received toll records for a telephone number being used by Co-defendant Clifford Jennings. Review of the records showed thirty nine calls between JONES and Jennings from November 2, 2014 to February 2, 2015.[9]

27. On October 26, 2015, the FBI recorded a consensual call between CW-1, JONES,

---

[9] Jennings, a/k/a Big Cliff has been identified as a Godfather of MSB VA. Jennings is charged in this indictment with violations of 18 USC 1962(d) and Title 21 USC 846 and 841(a)(1) and (b)(1)(A).

8

Michael Dove[10], and Maceba Hutchinson [11]. During this call MSB organization and business was discussed as well as the status of some MSB Virginia members' status.

28.     Throughout November and December 2015, JONES communicated with CW-1 via cellular telephone.[12] During this time frame JONES was using cellular number (347)424-9779 to communicate with the CW-1 and other MSB members.  During this series of calls discussion JONES and others discussed that Co-defendant Dove[13] was going to travel to New York to obtain heroin from JONES.

29.     On November 19, 2015, JONES and CW-1 spoke via telephone.  During the conversation, the two discussed Dove traveling from Virginia to New York to obtain controlled substances. JONES stated to CW-1 he needed to make some calls to obtain the narcotics.  During that same call. JONES advised CW-1 to hold any money CW-1 was going to give to Dove for the substances until he advised her otherwise. Several more calls were made between JONES, and CW-1 finalizing the arrangements for two part controlled substance purchase that occurred on November 20 and 23, 2015.

30.     On April 27, 2015, Michael JONES communicated with CW-1 via JONES' using his Facebook account user name "Diamond Millz."  JONES advised CW-1 that he was coming to Virginia to investigate allegations that another ranking MSB member, Terrance Brown, aka War was using cocaine, a violation of Blood rules. JONES advised CW-1 that he did not want

---

[10] Dove, a/k/a Dugatti Black has been identified as a High Stain or High 020, leader of MSB VA. Dove is charged in this indictment with for violations of 18 USC 1962(d) and Title 21 USC 846 and 841(a)(1) and (b)(1)(A).

[11] Hutchinson, a/k/a "Lady Messiah" has been identified as Godmother of the Mad Stone Divas a subset of MSB NY

[12] These calls were consensually recorded by the FBI.

[13] Michael Dove is a ranking MSB leader and co-defendant in this matter. He has been charged with violating 18 USC 1962 and Title 21 USC 841(a)(1) and (b)(1)(A) and 846.

9

3:17mj00030

other MSB members to know he was coming to Virginia until after he arrived.

31.     In April 2016, Michael JONES communicated with CW-1.  During this time frame CW-1 was present in New York meeting with MSB leadership. At times she spoke in person to Jones and others and was present and overheard calls made between Jones and other MSB leaders. At the time of the calls, Jones was using cellular number (917) 653-9249 at that time. The calls were consensually recorded by the FBI.  During the calls, JONES and CW-1 discussed MSB business, specifically issues MSB NY leadership was having with MSB VA leadership and some of the internal disagreements that were happening between MSB VA leadership and members.

32.     On April 23, 2016, CW-1 had traveled to New York City and met with several high ranking leaders of the MSB, including William Seeley a/k/a Pop Da Don, JONES, and others[14].  CW-1 had traveled from Virginia with the intent to purchase heroin from another MSB member, Rahun Page.[15] While in New York for these meetings, Seeley, JONES and CW-1 discussed CW-1 purchasing 14 grams of heroin from Jennings, in two separate conversations.

33.     The phone has been maintained in evidence since that time. I seek this warrant so an examination of the Device will comply with the Fourth Amendment and other applicable laws. The Device is currently in storage at the FBI Richmond Field Office, 1970 Parham Road, Richmond, Virginia.  In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the

---

[14] CW-1 consensually audio and video recorded this meeting.
[15] Rahun Page, a/k/a Eat Em Up, has been identified as a Lo Stain or Low 020, leader of MSB VA, who also lives in New Jersey and Pennsylvania. Page's criminal history includes; Malicious wounding, Residential robbery, Use of a firearm in the commission of a felony and other misdemeanor offenses.

10

Case 3:17-mj-00030-JCH   Document 1-1   Filed 06/15/17   Page 10 of 17   Pageid#: 11

same state as they were when the Device first came into the possession of the FBI.

**Probable Cause to Believe That the Device Contains Evidence, Fruits, and Instrumentalities**

34.     During the investigation, the FBI obtained, and continues to develop, evidence regarding the nature, scope, structure, and activities of the MSB.  The investigation has revealed that MSB is a criminal enterprise engaged in conspiracies to commit federal and state criminal offenses.  This evidence has been developed through multiple sources of information, including witness interviews, discussions with current and former members of MSB, confidential sources of information, consensual recordings, analysis of telephone toll records, Facebook records, physical and video surveillance, and the identification and review of historical criminal activities.

35.     Investigators have determined that MSB members utilize cellular phones and computers to communicate with other members to plan specific acts of violence and other crimes, discuss past criminal activity, and to further the goals of the organization.  They also use various social media networks to monitor, track, and communicate in furtherance of the organizations.

36.     From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use computer equipment, such as the Device, to carry out, communicate about, and store records regarding their daily activities.  These tasks are frequently accomplished through sending and receiving e-mail, instant messages, and other forms of phone or internet based messages; scheduling activities; keeping a calendar of activities; arranging travel; purchasing items; searching for information including information regarding travel and

11

activities; arranging for travel, accessing personal accounts including banking information; paying for items; and creating and storing images and videos of their movements and activities.

37.     Based on the investigation, I know that co-conspirators communicate with one another about violating the law.  I also know that intricate conspiracies most often involve a great deal of communication.  These communications may occur before, during, and after a crime is committed.  Co-conspirators employ a wide range of methods to communicate with one another on cellular telephones in order to discuss criminal activity and facilitate criminal plans. Some of these methods include: cellular telephone conversation, written correspondence (*i.e.,* email), instant messaging, text messaging and through social networks on the internet such as Facebook, My-Space, Twitter, Snapchat and WhatsApp.

38.     From my training, experience, and information provided to me by other agents, I am aware that individuals who engage in gang and drug trafficking frequently use computer equipment, including the Device, to facilitate their illegal activities, including by communicating with each via text message, email, and chats, in order to coordinate their drug distribution operations.  I know that criminal conspiracies are well thought out, which means plans are devised for a method in which the criminal activity will occur.  This may include research which could require the use of the internet via cellular telephones.

39.     Cellular telephones may contain text messaging between co-conspirators.  I know that text messaging is a common method of communication among individuals.  Most service providers that provide cellular service, maintain records of only the date and time that text messages are sent and received.  The content of these messages are not recorded or kept for a substantial amount of time, therefore investigators would be able to examine only those text

12

messages that are stored on the cellular telephone itself. Voice messages may also be accessed but, much like text messaging, the telephone companies do not record content in a permanent record. Cellular telephones also contain contact lists of names and telephone numbers of associates who may be part of the conspiracy that may be known or unknown to investigators. Cellular telephone users can save or delete their communicative digital data within their telephone settings, including but not limited to: recent calls, missed calls, text messages, voice mail, contacts (including names and telephone numbers), images/pictures and on social media apps.

40.     Based on my knowledge, training, and experience, I know that electronic devices such as the Device can store information for long periods of time. Similarly, information that have been viewed via the Internet are typically stored for some period of time on the Device. This information can sometimes be recovered with forensics tools.

41.     Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones (which are included in Attachment B's definition of "computer hardware") can now function essentially as small computers. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data.

42.     Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at https://support.apple.com/kb/sp705?locale=en_US, I know that the Device has capabilities that allow it to serve as a computer processor, a camera with video capture, and Wi-Fi capabilities.

13

The Device is equipped with a Global Positioning System. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

43.     I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

44.     As discussed above, Device is currently being stored in an evidence locker at the FBI Field Office, 1970 Parham Road, Richmond, VA. From my training and experience and the training and experience of law enforcement personnel who routinely handle this equipment, I understand that it has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when it first came into the FBIs' possession.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

45.     From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B in mobile phones, computer hardware, computer software, and storage media.

46.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

14

47.     As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b.   Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d.   The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual

15

information necessary to understand other evidence also falls within the scope of the warrant.

     e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

## <u>CONCLUSION</u>

    2.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

    <u>3.</u>    This warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

16

Respectfully ~~submitted,~~

Stephen Duenas
Special Agent
Federal Bureau of Investigation

```
Received by reliable electronic means
and sworn and attested to by phone on
June 15, 2017.
```

~~Subscribed and sworn to before me~~

~~on June 15, 2017.~~

UNITED STATES MAGISTRATE JUDGE